**In re the DETENTION OF Jeffrey GOODWIN.**

**State of Iowa, Appellee,**

v.

**Jeffrey Goodwin, Appellant.**

**No. 03–0871.**

Supreme Court of Iowa.

Nov. 19, 2004.

Mark Smith, First Assistant State Public Defender, and Greg Bal, Assistant Public Defender, for appellant.

Thomas J. Miller, Attorney General, and Cristen C. Odell–Douglass and Scott Brown, Assistant Attorneys General, for appellee.

CADY, Justice.

A jury found Jeffrey Allen Goodwin was a sexually violent predator subject to civil commitment under Iowa Code chapter 229A (2003). Goodwin appeals from the district court judgment ordering his civil commitment. He contends the district court's refusal to submit his requested special interrogatory to the jury violated his due process rights. For the following reasons, we disagree and affirm the district court judgment.

## I. Background Facts and Proceedings

Goodwin, who is now forty years old, has been in prison almost his entire adult life. He was first convicted when he was eighteen of criminal mischief in the third degree and operating without the owner's consent. He served three years and two months of his four-year sentence, which he completed in 1986. He was out of prison for eight to nine months before he committed his second offense of operating without the owner's consent. He returned to prison until 1988.

On October 14, 1988, around three weeks after his release, Goodwin entered a furniture store in Keokuk and sexually assaulted a female employee. After making small talk with the employee, Goodwin grabbed her and pulled her to the floor. He then attempted to undo her shirt and was able to unzip her pants. Goodwin then began "humping" her until she felt wetness on her clothing where his crotch

had been in contact with her body. Goodwin then tied her with twine and took $14 from her purse before leaving the store. Goodwin was ultimately convicted of second-degree robbery and assault with intent to commit sexual abuse. He was sentenced to fifteen years in prison. He was serving the sentence when the State initiated civil commitment proceedings.

While in prison, Goodwin sent the victim a Christmas card. He later pled guilty to third-degree harassment over the incident. He later sent a letter to the victim, which also resulted in a conviction for third-degree harassment. In 1998, he sent a third letter to the victim and was convicted of second-degree harassment.

On November 6, 2001, Goodwin was convicted of second-degree harassment for actions directed at a female prison guard. He made a list, entitled "Pain and Humiliation," which he acknowledged was aimed at intimidating the guard. The list was confiscated from Goodwin's cell. It listed various means to inflict pain and humiliation on women. The acts of pain included whipping, electric shock, cigar burns, pulling teeth, breaking bones, and death. The list of desired humiliation centered on various grotesque sexual matters.

Goodwin engaged in other conduct of a sexual nature while in prison. In October 1995, he told a female guard that he desired to assault her with a coat hanger. He also threatened to rape and torture her on multiple occasions. Goodwin also masturbated in her presence on several occasions. On one such occasion, he told her she was "his" and that the real fun would start when he was released from prison. In November 1995, Goodwin told the guard he was going to torture her and kill her. The guard made eleven reports of Goodwin's sexual misconduct. He received a total of four years of lockup time for these reports.

Goodwin also made disturbing statements to other prison employees. In 1999, he gave the unit manager of his cell house a letter in which he stated, "All I want to do is kidnap women and introduce them to zoophilia, S & M, bondage, and rape. This is what I'm being denied treatment for. So denying me access to treatment isn't hurting me, but women." In another letter, he wrote, "I'll just send you people the newspaper clipping of the missing women i kidnap, torture and violate. And you people can apologize to their familys. Because i'm not going to keep trying to go to Mt. Pleasant."[1] On October 6, 1999, Goodwin gave a four-page letter to the guard detailing the torture and rape of a woman. At the end of the letter, he wrote, "This is what will probably happen if i don't get the treatment i need and requested, but been denied so far." Referring to the four-page letter, he later told her, "you keep f——ing with me, ... I would make that part of your reality, you know."

Additionally, a prison nurse detailed the following statements Goodwin made to her:

He said that when he got out of prison that he would do it again; that he would re-offend; that he would use whips; that it was all about control; that I would not understand how it made him feel to control women like that.

He also made the statement that he picked his women by choosing women that had something that they would want to return to, such as family or children, so that they would comply to

---

his wishes, or whatever he had them do—they would comply in hopes of being released.

. . . .

He had made the statement to me that he had been in prison for twelve years, and that he had been in too long. And that he had tried to see women as human beings with feelings, but that he just couldn't do it. He basically said they were objects, and that he had become more hardened towards women since he had been in prison.

The prison psychologist indicated that Goodwin discussed

sexual fantasies that ... were very sadistic. They involved kidnapping women, torturing them with various devices. He fantasized different ways that he could get access to women to control them. ... He said that he became aroused from fantasizing about the sadistic part of his fantasies.

In addition, Goodwin admitted that during a session with the psychologist, he placed his foot on her chair in between her legs to see if he could "get away with it." After this incident, she stopped working with him for a year.

The discharge date for Goodwin's sentence was October 2, 2002. On September 6, 2002, the State filed a petition to commit him as a sexually violent predator under Iowa Code chapter 229A. A jury trial commenced on April 28, 2003.

The jury heard the testimony concerning Goodwin's background and history. The State also called Dr. Dennis M. Doren, a psychologist, as an expert witness. Based on a review of Goodwin's Department of Corrections records, his criminal history, and an interview, Dr. Doren opined that Goodwin suffers from three mental conditions: sexual sadism,[2] exhibitionism,[3] and antisocial personality disorder.[4] He opined that Goodwin has a mental abnormality that makes it likely he will engage in sexually violent offenses if not confined to a secure facility. Dr. Doren did not base his opinion that Goodwin would reoffend solely on the diagnosis of antisocial personality disorder. He explained:

There are a few things that distinguish Mr. Goodwin compared to many other people who would be properly diagnosed antisocial personality disorder.

One of those is the repetitively sexual nature of his pattern of disregard for and violation of the rights of others, that being what antisocial means. That includes the 1988 offense on [the furniture store employee]. It includes the masturbating publicly. It includes the verbal comments, the verbalizations that

---

2. Dr. Doren stated this
 means that the person is sexually aroused by the infliction of pain or humiliation to individuals; that it has been a condition that has existed for at least six months; and, has caused some type of emotional distress or impairment in that person's life.

3. According to Dr. Doren,
 Exhibitionism is a sexual disorder. It means the person is sexually aroused by exposing his genitals to unsuspecting others. Again, it's something lasting for at least six months and causing some type of impairment to the person's life or distress.

4. Dr. Doren explained antisocial personality disorder as follows:

 This is not a sexual disorder. Personality disorder is a—let me use a generic concept—is a chronic, maladaptive pattern of behavior and inner-experience that causes the person impairment in his life. ... And that pattern of behavior is described as disregard of the rights of others.

 He stated that antisocial personality disorder does not necessarily relate to sexual offending, but it can in certain individuals.

are sexual. It includes the written comments that are sexual in nature.

By no means is his pattern only sexual, but there is a great deal of sexuality in his pattern.

The second thing that distinguishes Mr. Goodwin is that he is also someone who scores very highly in a—How do I say it? He very much fits the criteria for a subtype of antisocial personality disorder that is not particularly common, not so common in the prison setting, and that is the concept of the psychopath.

. . . .

... A score of 36 [on the psychopathy checklist], even compared to the adult, male inmates, antisocial or otherwise, puts him in the top 2 percent of psychopathy compared to the adult male inmates. Clearly atypical even compared to the usual incarcerated antisocial personality disorder individual.

Dr. Doren further testified that all three of Goodwin's conditions—sexual sadism, exhibitionism, and antisocial personality disorder—affect Goodwin's emotional and volitional capacity, predispose him to commit sexually violent offenses, and cause him to have a serious difficulty controlling his behavior.

Goodwin called Dr. Thomas G. Gratzer, a psychiatrist, as his expert witness. Dr. Gratzer opined that Goodwin has neither sexual sadism nor exhibitionism. With respect to whether Goodwin meets the statutory definition of a sexually violent predator, Dr. Gratzer testified,

mental abnormality to my mind would mean a psychiatric disorder, a major mental illness, that in my opinion Mr. Goodwin, while he has an antisocial personality disorder, does not have a major mental illness; does not have a sexual disorder. So he doesn't have a mental abnormality, as I would understand that term, although he clearly is antisocial.

Dr. Gratzer testified, "I think antisocial personality disorder predisposes an individual to commit criminal acts. I don't agree it predisposes an individual to commit sexual offenses." He further explained,

I don't believe an antisocial personality disorder is a condition that you would associate with inability to control. It refers to personality issues, or characterological issues. We hold those people accountable in the criminal system or in society, more generally. We believe they can control their behavior. If they choose not to control their behavior, that's a separate issue.

On cross-examination, Dr. Gratzer conceded that because criminal acts in general include sexual offenses, Goodwin's antisocial personality disorder predisposes him to commit sexual offenses. He also stated that Goodwin's repeated misconduct "could be" indicative of an inability to control his behavior.

Goodwin requested the following special interrogatory be submitted to the jury as a part of the jury instructions:

We find beyond a reasonable doubt that the respondent suffers from the following mental abnormalities:

1. Sexual Sadism _____
 (write NO or YES)

2. Exhibitionism _____
 (write NO or YES)

3. Antisocial Personality Disorder _____
 (write NO or YES)

Goodwin argued that if the jury determined that he only suffered from antisocial personality disorder, he could not have a mental abnormality for the purposes of civil commitment.

The court rejected the request for the interrogatory and instructed the jury, "The law does not require jurors to agree which mental abnormalities were proven by the evidence. The law only requires that each juror agree that the Respondent suffers from at least one mental abnormality." The verdict form submitted to the jury required only that it answer yes or no to one question: "Is the Respondent, Jeffrey A. Goodwin, a sexually violent predator?" The jury answered "yes" on April 30, 2003, and the court ordered that Goodwin be placed in the Civil Commitment Unit for Sexual Offenders at Oakdale.

Goodwin appeals. He claims the jury should have been required to identify whether his underlying mental abnormality was based solely upon his diagnosis of an antisocial personality disorder because commitment as a sexually violent predator under those circumstances would violate the Due Process Clause.

## II. Standard of Review

 When violation of a constitutional right is claimed, the standard of review is de novo. *State v. Tague,* 676 N.W.2d 197, 201 (Iowa 2004) (citing *State v. Naujoks,* 637 N.W.2d 101, 106 (Iowa 2001)). "The court makes an 'independent evaluation of the totality of the circumstances as shown by the entire record.'" *Id.* (quoting *State v. Turner,* 630 N.W.2d 601, 606 (Iowa 2001)). "We give considerable deference to the trial court's findings regarding the

credibility of the witnesses, but are not bound by them." *Id.* (citing *Turner,* 630 N.W.2d at 606; *State v. Liggins,* 524 N.W.2d 181, 186 (Iowa 1994)).

## III. Discussion

 The claim raised by Goodwin fails for two reasons. First, we have rejected the underlying assumption upon which the claim is based. In *In re Detention of Barnes,* 689 N.W.2d 455, 460 (Iowa 2004), filed on this date, we held that antisocial personality disorder can serve as the mental abnormality upon which commitment is based, so long as the other elements of the statute are satisfied. Second, chapter 229A does not require the fact finder to determine which particular mental abnormality satisfies the statute, just as it does not require a determination of the specific sexually violent offense that supports commitment. Thus, a person with multiple disorders may be committed under the statute as long as the fact finder determines that at least one of the disorders meets the requirements of the statute and the remaining requirements are met. Consequently, the district court did not abuse its discretion in refusing to submit the requested special interrogatory. *See Six v. Freshour,* 231 N.W.2d 588, 594 (Iowa 1975) (noting that the trial court has considerable discretion to submit special interrogatories to a jury). There was ample evidence in the record that Goodwin suffered from three separate mental abnormalities and that each predisposed him to commit sexually violent offenses. The requested interrogatory "raise[d] no question[ ] which would be decisive of any ultimate issue in this case." *Id.*[5]

---

**5.** We recognize Iowa Rule of Civil Procedure 1.934 provides that "[t]he jury in a case in which it renders a general verdict may be required by the court, and must be so required on the request of any party to the action, to find specially upon any particular questions of fact...." Nevertheless, this rule does not require the district court to submit all interrogatories requested by the parties. The trial court has discretion to refuse to

## IV. Conclusion

We conclude the district court's refusal to submit Goodwin's requested special interrogatory to the jury was not an abuse of discretion. Additionally, we find his civil commitment as a sexually violent predator does not violate due process. The judgment of the district court is affirmed.

**AFFIRMED.**

submit a requested interrogatory that fails to pose a question that is "essential to the jury's determination of the case." *Berghammer v. Smith,* 185 N.W.2d 226, 236 (Iowa 1971).